1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT
9                     EASTERN DISTRICT OF CALIFORNIA
10

11   WILLIAM BERNAL, et al.,                    No. 2:19-cv-00482-MCE-AC

12              Plaintiffs,

13        v.                                    **MEMORANDUM AND ORDER**

14   SACRAMENTO COUNTY SHERIFF
     DEPARTMENT, et al.,
15
16              Defendants.

17

18        Plaintiffs William and Celia Bernal (collectively, "Plaintiffs") seek to recover from

19   multiple entities and individuals for constitutional injuries purportedly sustained during

20   the investigation of allegations that their son, Ryan Bernal ("Ryan") had made threats to

21   engage in a shooting at a local high school.[1]  Presently before the Court is a Motion for

22   Summary Judgment filed by the County of Sacramento ("County") (erroneously sued as

23   the Sacramento Sheriff's Department), Sacramento County Sheriff Scott Jones

24   ("Jones"), and Sacramento County Sheriff's Deputies Couch, Winkel, Kennedy, Sutter,

25   Chhlang, Bliss, and Quakenbush ("Deputy Defendants" and collectively with the County

26   and

27   _____

28        [1] The Court will hereafter refer to the Bernals by their first names rather than their surnames for
     purposes of clarity.

                                              1

1 | ///

2 | Jones, "Moving Defendants").  ECF No. 27.[2]  For the following reasons, Moving

3 | Defendants' Motion is GRANTED.[3]

4

5 | <center>**BACKGROUND**[4]</center>

6

7 | At approximately 10:00 a.m. on March 5, 2018, the Folsom Police Department

8 | ("FPD") asked the Sacramento County Sheriff's Department ("SSD") to help find Ryan

9 | after FPD received credible information from Vista Del Lago High School that Ryan had

10 | threatened to go there to "shoot up the school, and [March 5, 2018] was the day."[5]  SSD

11 | agreed, and Deputy Defendants met in a parking lot around the corner from Ryan's

12 | address of record in Sacramento, California.  Chhlang performed a premises history

13 | check on the address and identified Celia as a resident.  He then called Celia and

14 | identified himself as a deputy with the SSD.  Chhlang advised Celia that he was

15 | investigating a complaint and needed to find Ryan.  When Celia spoke to Chhlang, she

16 | had already received a call from the school advising her that Ryan was not in attendance

17 | and had purportedly been making comments regarding a shooting at his high school.[6]  In

18

19 | [2] Plaintiffs name various additional entities and individuals as defendants as well.  The docket

20 | does not reflect that any of these additional defendants have appeared.  Accordingly, not later than ten (10) days following the date this Memorandum and Order is electronically filed, Plaintiffs are ordered to show cause in writing why their claims against the non-moving Defendants should not be dismissed

21 | pursuant to Federal Rule of Civil Procedure 41(b).

22 | [3] Because oral argument would not be of material assistance, the Court ordered this matter submitted on the briefs.  See E.D. Cal. Local R. 230(g).

23

24 | [4] Unless otherwise indicated, the following facts are taken from Defendants' Statement of Undisputed Facts and Plaintiffs' responses thereto.

25 | [5] This was less than three weeks after an individual killed 17 people and wounded 17 others in a shooting at Marjory Stoneman Douglas High School in Parkland, Florida.  Every individual Defendant was

26 | aware of the Parkland school shooting that occurred shortly before the day in question and knew that copy-cat events were possible.  They also all believed that locating Ryan was a time-sensitive matter.

27 | [6] The parties quibble about exactly what was said in the call from the school, but, at the very least,

28 | Celia confirmed at her deposition that this phone call left her with the impression Ryan was suspected of making shooting threats.  Ex. 10, Celia Bernal Dep., ECF No. 27-5, at 38:14-40:5.

<center>2</center>

1  ///

2  response to Chhlang's call, Celia stated something to the effect of, "I do know where he

3  is, but I am not going to tell you."

4      Deputy Defendants subsequently left the parking lot and proceeded to the Bernal

5  residence.  All Deputy Defendants were in full uniform and marked patrol cars identifying

6  themselves as law enforcement.  Upon their arrival at the residence, Deputy Defendants

7  saw a male and female matching the descriptions and photos of Celia and William.

8      Chhlang and Kennedy approached Celia and identified themselves as deputies

9  with SSD and asked to speak to her.  As the deputies walked up the driveway, Celia got

10  into an SUV while William walked near the vehicle's hood.  According to an affidavit

11  Celia submitted in support of Plaintiffs' Opposition, Chhlang spoke to Celia as she came

12  out of the house and asked if Ryan was home, to which Celia stated "No."  ECF No. 30-

13  2, ¶ 4.

14      Kennedy ordered Celia to stay out of the vehicle, but she did not comply and

15  entered it instead.  He then ordered Celia to exit the vehicle, after which Chhlang saw

16  the brake lights illuminate, leading him to believe that Celia had started it.  Kennedy was

17  behind the vehicle when the brake lights came on, walked up toward the driver's side

18  and ordered Celia to stop and exit.  He then reached into the car to remove the keys, but

19  Celia attempted to block him from doing so.  Kennedy and Chhlang each at different

20  points held Celia's left forearm and Winkel restrained Celia's right arm.  Celia's arms

21  were released as soon as she calmed and followed commands.[7]  Celia was escorted out

22  of the vehicle by Winkel and Kennedy and asked to sit in a plastic chair in her front yard.

23  Couch, Sutter, Bliss, and Quackenbush did not touch Celia.

24      In the interim, Deputy Defendants saw William walk down the driveway in front of

25  the SUV.  William is approximately 6'3" and 290 pounds.  Chhlang, on the other hand, is

26  _____

27      [7] Although Plaintiffs ostensibly dispute this fact and state that Celia's arms were not released "until
   some period of time after William had been handcuffed and frog-marched to the squad-car," her
   declaration indicates she was still yelling for officers to stop during this time and was thus still agitated and
28  non-cooperative.  Celia Bernal Decl., ECF No. 30-2, ¶ 10-11.

approximately 5'7" and 150-160 pounds.  Unbeknownst to officers at the time of the initial encounter, William's shoulders, knees and neck had previously been surgically repaired.

A nearby witness, Gary Turner, described William's behavior as "belligerent" during his encounter with Deputy Defendants, in that William "came out yelling and screaming and was holding the phone filming and yelling at the deputies at the time, and they asked him to calm down and put the phone down."  Turner Dep., ECF No. 27-5, at 45:12-23.

According to Bliss, William reached into a small bag on the hood of the SUV while the other deputies were dealing with Celia.  Plaintiffs do not dispute that William was carrying a bag, although they note that the witness Turner did not notice it, and, according to Celia's declaration, she did not see William reach into the bag at any point.  According to William, he set his bag on the hood of the vehicle and pulled his phone from under his arm to start recording.  Bliss, fearing William was going to remove a weapon from the unsearched bag, drew his weapon.  Chhlang then attempted to gain control of William, but William elbowed him in the chest.  According to William, Bliss then holstered his firearm and assisted Chhlang in gaining physical control of William.

Due to William's size and resistance, Chhlang pushed William forward onto the hood of the SUV to gain leverage utilizing a rear twist-lock control hold on William's arm.  William contends that Bliss and Chhlang then kicked his knees out, slammed his head into the hood of the car, and wrenched his arms outside their surgically repaired range of motion.  After being advised that William suffered from the aforementioned shoulder injury, Couch utilized two sets of handcuffs to handcuff William via a "daisy chain" approach.  William was placed in Bliss's patrol car with the door closed for approximately ten minutes.  In the interim, William apologized for striking Chhlang in the chest.

Winkel conducted a visual sweep of a recreational vehicle ("RV") in Plaintiffs' driveway by either sticking his head through a window or opening the door and determined Ryan was not there.  Officers were thereafter able to confirm that Ryan was

4

at his grandmother's house.  William and Celia drove to that location, as did law enforcement, and Ryan was apprehended.  He was charged with felony and misdemeanor violations of California Penal Code § 422 for making threats to commit a crime resulting in death or great bodily injury to another person and California Penal Code § 29825(b) for unlawful possession of a firearm.  Ryan ultimately pled no contest to a misdemeanor violation of § 422 based on his conduct.

William and Celia thereafter initiated this action setting forth causes of action under both federal and state law.  Federally, they allege Defendants violated their Fourth Amendment rights to be free from unreasonable search and seizure.  More specifically, they contend that they were unlawfully detained, Defendants used excessive force in effectuating their detention, and Defendants unlawfully searched their vehicle and RV and trespassed on their lawn.  They also set forth state claims for Assault, Battery, False Imprisonment, Intentional Infliction of Emotional Distress, and violation of California's Bane Act, California Civil Code § 52.1.  For the following reasons, the Court concludes that Defendants are entitled to judgment as a matter of law on Plaintiffs' federal claims, and it declines to exercise supplemental jurisdiction over their state law causes of action.

**STANDARD**

The Federal Rule of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial

1  responsibility, the burden then shifts to the opposing party to establish that a genuine

2  issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co., Ltd. v.

3  Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co.,

4  391 U.S. 253, 288-89 (1968).

5         In attempting to establish the existence or non-existence of a genuine factual

6  dispute, the party must support its assertion by "citing to particular parts of materials in

7  the record, including depositions, documents, electronically stored information,

8  affidavits[,] or declarations . . . or other materials; or showing that the materials cited do

9  not establish the absence or presence of a genuine dispute, or that an adverse party

10  cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The

11  opposing party must demonstrate that the fact in contention is material, i.e., a fact that

12  might affect the outcome of the suit under the governing law.  Anderson v. Liberty Lobby,

13  Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and

14  Paper Workers, 971 F.2d 347, 355 (9th Cir. 1992).  The opposing party must also

15  demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is

16  such that a reasonable jury could return a verdict for the nonmoving party."  Anderson,

17  477 U.S. at 248.  In other words, the judge needs to answer the preliminary question

18  before the evidence is left to the jury of "not whether there is literally no evidence, but

19  whether there is any upon which a jury could properly proceed to find a verdict for the

20  party producing it, upon whom the onus of proof is imposed."  Anderson, 477 U.S. at 251

21  (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original).

22  As the Supreme Court explained, "[w]hen the moving party has carried its burden under

23  Rule [56(a)], its opponent must do more than simply show that there is some

24  metaphysical doubt as to the material facts."  Matsushita, 475 U.S. at 586.  Therefore,

25  "[w]here the record taken as a whole could not lead a rational trier of fact to find for the

26  non-moving party, there is no 'genuine issue for trial.'"  Id. 587.

27         In resolving a summary judgment motion, the evidence of the opposing party is to

28  be believed, and all reasonable inferences that may be drawn from the facts placed

1   before the court must be drawn in favor of the opposing party.  Anderson, 477 U.S. at

2   255.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

3   obligation to produce a factual predicate from which the inference may be drawn.

4   Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd,

5   810 F.2d 898 (9th Cir. 1987).

6

7                                          **ANALYSIS**

8

9          The Constitution does not prohibit all searches and seizures of person or

10  property.  Rather, it protects the citizenry from unreasonable government overreach.

11  The crux of the Court's inquiries here, then, all turn on reasonableness: (1) "whether . . .

12  the detention was reasonable," Maxwell v. County of San Diego, 708 F.3d 1075, 1083

13  (9th Cir. 2013); (2) whether the force used in effectuating that detention was objectively

14  reasonable, Graham v. Connor, 490 U.S. 386, 399 (1989); and (3) whether any search

15  of Plaintiffs' vehicle, front yard, and RV was reasonable, Brigham City v. Stuart, 547 U.S.

16  398, 403 (2006).  The Court concludes that based on the undisputed facts in this case

17  the challenged conduct was not only reasonable, but was necessary, to prevent an

18  imminent, catastrophic tragedy.

19         **A.      Reasonableness of the Detention**

20         To determine the reasonableness of Plaintiffs' detention, "[the Court] look[s] to

21  'the gravity of the public concerns served by the seizure, the degree to which the seizure

22  advances the public interest, and the severity of the interference with individual liberty.'"

23  Maxwell, 708 F.3d at 1083 (quoting Brown v. Texas, 443 U.S. 47, 51 (1979)).

24  "[D]etention of witnesses for investigative purposes . . . must be minimally intrusive."  Id.

25         The gravity of the public concerns and the degree to which the seizure advanced

26  the public interest in this instance were of the utmost importance.  Unlike many cases,

27  Deputy Defendants detained Plaintiffs not to investigate a past crime, but to prevent the

28  commission of a new crime.  Plaintiffs admit the information on which Defendants were

                                                7

1  acting was credible, and, as Ryan's parents, they were in the best (if not the only)

2  position to assist officers in finding their son before he took irreversible actions to ruin his

3  own life and the lives of countless others.

4        In contrast, the interference with Plaintiffs' liberties was minimal.  They were

5  detained for a short period of time on their own property to allow officers to question

6  them as to Ryan's whereabouts.  As discussed further below, force was only employed

7  in response to Plaintiffs' resistance and was mitigated once they complied with officer

8  commands.  On balance, given the gravity of the public interest in preventing school

9  shootings, and the minimally intrusive nature of Plaintiffs' seizure, the Court concludes

10  the detention was reasonable as a matter of law.[8]

11        In opposition, Plaintiffs focus entirely on their theory that the encounter was

12  initially consensual but Celia at some point withdrew her consent, rendering the

13  remainder of any detention unconstitutional.  Whether or not Plaintiffs consented initially

14  to answering any questions, however, is irrelevant.  Regardless of any consent, under

15  the totality of the circumstances, officers had the authority prior to making any personal

16  contact with Plaintiffs at their residence to detain them as material witnesses for the

17  short period of time at issue here to attempt to garner information that would help them

18  to establish the location of a would-be shooter.  No other conclusion makes sense.

19        In fact, the Court is at a loss to conceive what Plaintiffs would have had the

20  officers do instead.  When Celia advised officers that her son was not home, should

21  officers have immediately given up on questioning her despite the fact that she had

22  already admitted she knew where Ryan was?  Should they have abandoned their

23  questioning despite the fact that it is undisputed they were acting on credible information

24  that a threat had been made and at least Celia had material information?  Should

25          [8] The Court has concluded that the detention of Plaintiffs was reasonable given the public interests

26  in locating Ryan and the minimal nature of the intrusion on Plaintiffs' rights.  Even if that was not the case, however, officers were entitled to detain Plaintiffs for questioning for at least some short period of time

27  when they arrived at Plaintiffs' residence.  Plaintiffs were thus not free to ignore officer commands or to leave.  When Plaintiffs subsequently failed to comply with officer directives, and even struck one officer,

28  probable cause was established to arrest them under California Penal Code § 148 and/or § 69, which independently justified their further detention.

officers have walked away knowing they were potentially leaving hundreds if not thousands of students to innocuously start their school day at risk of being killed by someone that could have been stopped?  These options are absurd, and just posing these questions makes clear the answer: the detention of the non-cooperative Plaintiffs was Defendants' only reasonable alternative under the circumstances.

### B.    Use of Force

Given the propriety of Plaintiffs' detention, the officers use of essentially minimal force was objectively reasonable as well.  See Graham, 490 U.S. at 398.  "Graham sets out a non-exhaustive list of factors for evaluating reasonableness: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape."  Maxwell, 708 F.3d at 1086.  "Because this inquiry is fact-sensitive, summary judgment should be granted sparingly."  Id.  In this case, however, the material facts are undisputed.

It is undisputed that, in the wake of a horrific school shooting, officers had received credible information that Ryan was threatening to commit a similar act at his own high school.  The severity of the crime could not have been much greater.  Officers did not know at the time whether Celia, at the wheel of an operational vehicle, might pose a risk to them, and given William's demeanor and actual physical resistance, it is reasonable to infer that he presented some risk to officer safety.  More importantly, though, based on the undisputed facts, Plaintiffs certainly attempted to resist detention and evade officers.

In response, officers used a very minimal level of force to detain Plaintiffs.  Celia ignored orders to stop and exit her vehicle, so officers manually restrained her arms to prevent her from driving away.  That is the least amount of force they could have employed to effectuate the detention of a non-cooperating witness.

Officers' use of force with regards to William was greater, but so too was his potential threat.  It is undisputed that William was a large man, behaving belligerently

9

1   and carrying a bag, the contents of which were unknown.  Whether he actually reached

2   into his bag at any point is irrelevant; he still had immediate access to it and was

3   resisting efforts for law enforcement to question him, even going so far as to strike one of

4   the officers.  It is logical that when an agitated individual has access to unknown objects

5   in a bag in his immediate vicinity, an officer would draw his weapon preemptively to

6   cover himself and his fellow officers from whatever weapon might be produced from that

7   sack.[9]  Under these circumstances, forcefully pushing William onto the hood of the car in

8   order to apply handcuffs was imminently reasonable as well, especially given that the

9   officers applied an additional set of handcuffs to alleviate any pain once advised of

10  William's lack of shoulder mobility.

11      Plaintiffs do not address any of the foregoing in opposition and instead again

12  hang their hats on their theory that the only basis for their detention was their consent.  If

13  that was the case, then it follows that any use of force would have been impermissible.

14  Because the Court has already concluded that officers had an independent justification

15  for detaining Plaintiffs, that argument is a non-starter.  Under the undisputed facts of this

16  case, the officers' use of force was reasonable.

17      **C.    Search of the Vehicle, Front Yard, and RV**

18      Finally, Plaintiffs aver in their First Amended Complaint ("FAC") that their vehicle,

19  front yard, and RV were unreasonably searched.  There is no evidence before the Court,

20  however, indicating that either the yard or the vehicle themselves were searched.

21  Officers could purportedly see through the vehicle windows, but that does not constitute

22  a search.  See United States v. Orozco, 590 F.2d 789, 792 (9th Cir. 1979).  Nor was it a

23  search for officers to walk through Plaintiffs' front yard to talk to Plaintiffs.  See United

24  States v. Hammett, 236 F.3d 1054, 1059 (9th Cir. 2001) ("Law enforcement officers may

25  encroach upon the curtilage of a home for the purpose of asking questions of the

26      [9] Celia avers in her recent declaration that she did not see William reach into his bag.  That is
27  neither here nor there for the reasons set forth herein.  Given William's conduct and the fact that the
    contents of the bag were a mystery, the officer was justified in drawing his gun simply given the proximity
    of William to the bag itself.  That said, if William was not reaching into his bag, it seems he could have
28  simply submitted a declaration saying so.  It is troubling to the Court that no such statement was made.

occupants.").  Finally, the brief visual search of the RV was reasonable as a protective sweep.  See United States v. Lemus, 582 F.3d 958, 962 (9th Cir. 2009); see also Ryburn v. Huff, 565 U.S. 469 (2012).  Time was of the essence and locating Ryan was of utmost import.  Ensuring that he was not in the RV permitted officers to ensure Ryan was not hiding at the home so they could focus their efforts elsewhere.

Again, Plaintiffs do not dispute any of the foregoing in their opposition.  Instead, they argue only that the search of their residence was unlawful.  No search of their residence is pled in Plaintiffs' FAC, and that theory will thus not be considered. Defendants are entitled to judgment as a matter of law on Plaintiffs' search-related claims.[10]

**CONCLUSION**

For the reasons set forth above, Moving Defendants' Motion for Summary Judgment (ECF No. 27) is GRANTED.  Not later than ten (10) days following the date this Memorandum and Order is electronically filed, Plaintiffs are ordered to show cause in writing as to why their remaining claims should not be dismissed pursuant to Federal Rule of Civil Procedure 41(b).  Failure to timely respond will result in the dismissal of the remainder of this case with prejudice upon no further notice to the parties.  The Court will entertain any request for attorneys' fees and costs based on the timing set forth in the applicable rules of this Court and the Federal Rules of Civil Procedure.

IT IS SO ORDERED.

DATED:  April 4, 2022

MORRISON C. ENGLAND, JR.
SENIOR UNITED STATES DISTRICT JUDGE

---

[10] Defendants met their burden as to the constitutionality of all of Plaintiffs' federal claims.  Any federal claims against the County and Jones are derivative and thus fail as well.  The Court also notes that even if a jury could find that the officers' conduct was at any point during their interaction with Plaintiffs unreasonable, the officers would be entitled to qualified immunity because Plaintiffs did not demonstrate that "the law clearly established that [Defendants'] conduct was unlawful in the circumstances of the case." Saucier v. Katz, 533 U.S. 194, 201 (2001).

11